# FOR PUBLICATION



ATTORNEYS FOR APPELLANT:

**LISA M. TRAYLOR-WOLFF**
Public Defender
Logansport, Indiana

**MARK LEEMAN**
Public Defender
Logansport, Indiana

ATTORNEYS FOR APPELLEE:

**CHRISTINE M. REDELMAN**
DCS Central Administration

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF ) 
THE PARENT-CHILD RELATIONSHIP OF: )

S.S.; J.S.; and C.S. (Minor Children) and, )

  T.S. (Mother), )
                           )
     Appellants-Respondents, )
                         )
         vs. )   No. 09A02-1211-JT-936
                         )
THE INDIANA DEPARTMENT OF )
CHILD SERVICES, )
                         )
     Appellee-Petitioner. )

### APPEAL FROM THE CASS CIRCUIT COURT
The Honorable Leo T. Burns, Judge
Cause Nos. 09C01-1207-JT-15, 09C01-1207-JT-16, 09C01-1207-JT-20

**June 27, 2013**

**OPINION—FOR PUBLICATION**

**BAKER, Judge**

In this case, appellant-respondent T.S. (Mother) argues that she was denied due process when the juvenile court terminated her parental rights to three of her children after denying her motion for a continuance. More particularly, Mother contends that she should have been permitted additional time to be present at the termination hearing because she resides in Florida.

Child protective services from three different states have been involved with Mother and her three children, C.S., S.S., and J.S. (collectively, "the Children") at some point over approximately the past three years; however, it was the appellee-petitioner Indiana Department of Child Services (DCS) that filed a petition alleging the Children to be Children in Need of Services (CHINS) and eventually filing a petition for the termination of the parent-child relationship between Mother and the Children.

After the Children had been removed from Mother's care, but before the termination hearing, Mother moved to Florida where she was expecting her fourth child. The DCS and Mother's attorney communicated with Mother, and she was aware of the date of the termination hearing. Nevertheless, on that day, Mother's attorney filed a motion for a continuance based on Mother's absence. The juvenile court denied the motion.

Although Mother's interest in the care and custody of her children is significant, the State's interest in protecting these children is also very significant in light of Mother's inability to protect herself from domestic abuse and to properly attend to the Children's medical and mental needs. When this is balanced against the low risk of error because Mother was represented by counsel, voluntarily left Indiana, and was aware of the termination hearing, we conclude that she was not denied due process when the juvenile court denied her motion to continue. Accordingly, we affirm.

## FACTS

Mother began dating S.S. (Father), when she was fifteen years old and became pregnant with their first child when she was seventeen. The couple had three children who are the subject of these proceedings: C.S. was born on February 7, 2007; S.S. was born on November 26, 2009; and, J.S. was born on October 22, 2010.

In 2010, Florida Child Protective Services (CPS) intervened after Father physically assaulted Mother while she was pregnant with J.S. Father was arrested for aggravated battery on Mother and was sentenced to thirteen months imprisonment. A No Contact Order was issued, but Mother brought J.S. to visit Father twice after his birth. Upon Father's release in 2011, he was deported to Mexico and is not a party to these proceedings.

At some point in 2011, the family moved to Kentucky. Apparently, Mother and the Children experienced difficulties while residing there because Kentucky CPS intervened. Specifically, an investigation had been ongoing since May 2011. The family

3

had been evicted, was homeless, and Mother was "low functioning." Appellee's App. p. 63.

On July 8, 2011, Kentucky CPS requested that the DCS conduct a courtesy interview because Mother was residing in Cass County. On July 15 and 18, 2011, the DCS received a report that J.S. had been diagnosed with failure to thrive, was scheduled to have a G-tube installed, and there were concerns regarding Mother's ability to care for J.S.

During the DCS interview, Mother and R.H. (Boyfriend), who was also Mother's first cousin, exhibited problems. Additionally, C.S. became aggressive and would bite S.S. on the face, causing significant bruising. S.S. also had untreated ringworm. The assessment further revealed that:

- Mother believed that C.S. had only a few days left of her seizure medication; however, Mother had been overmedicating C.S., and there was no prescription for a refill when the medication ran out.

- C.S. was nonverbal, and Mother failed to follow up on concerns that the child had autism.

- C.S. received stitches after hitting her head on a table at the hospital.

- Mother left C.S. restrained in a stroller for long periods of time because she was active and would get into things.

- Mother arrived at the hospital with C.S. and S.S. but did not bring any clothing for them.

- Mother refused to discipline the children because as a child, Mother had been removed from her mother's care because of physical abuse.

- Boyfriend did not feel that the children were safe with Mother.

4

- Mother left eight-month-old J.S. alone at Riley Children's Hospital (Riley) for several days before she arrived.

- Mother was unable to pass G-tube training, unable to feed J.S., and J.S. failed to gain weight under her care.

- Mother was not sure where she would live in the near future and was not even certain she would stay in Indiana, which was a concern for Riley because medical personnel had to mail J.S.'s medication.

- Mother was pregnant with Boyfriend's child and was not receiving prenatal care.

Appellee's App. p. 63-64.

The DCS removed the children, and on July 21, 2011, the DCS requested and received permission to file a petition alleging that C.S., S.S., and J.S. were CHINS. On October 19, 2011, a fact-finding hearing was held on the CHINS petition, and the juvenile court determined that the Children were CHINS after Mother admitted that her housing was unstable, J.S. was diagnosed with failure to thrive, C.S. was diagnosed with autism, Mother needed assistance obtaining medical care for the Children, and intervention was necessary for the Children to receive the needed services. Appellee's App. p. 41-43.

On December 1, 2011, the juvenile court entered its dispositional order ordering Mother, among other things, to:

- Contact the DCS weekly;

- Notify the DCS of any change in address, household composition, telephone number, employment, arrest, or criminal charges;

5

- Enroll and participate in any recommended services without delay or missed appointments;

- Maintain safe, stable housing;

- Secure and maintain legal income;

- Assist in the formulation of a protection plan;

- See that the children are properly clothed, fed, and supervised;

- Participate in home-based services to address issues of housing, budgeting, parenting, and sobriety;

- Complete a parenting assessment and follow all recommendations;

- Meet all medical, mental health, and dental needs of the children, including attending all appointments, following directions, and giving medications;

- Refrain from domestic violence and report it if it occurs;

- Comply with the terms of the no-contact order or protective order;

- Attend all visits, meet the children's needs during that time, and implement parenting techniques learned in home-based services.

Appellee's App. p. 76-78.

Instead of following the orders in the dispositional decree, Mother left Indiana in December 2011. She claimed that she was going to Alabama to visit family and would return. Christina Scherer, a home-based service provider, remained in contact with Mother through February 2012 and attempted to determine when Mother would return. However, Mother changed her phone number and refused to provide her address to Scherer or the DCS.

Although Mother informed Scherer that she would attend the May 16, 2012 permanency hearing, she failed to appear. Furthermore, Mother did not inform the DCS that she was traveling to Florida. The DCS discovered that Mother was in Florida when Florida CPS contacted the DCS about Mother.

On July 5, 2012, the DCS filed a petition to involuntarily terminate the parent-child relationship between Mother and the Children. On July 31, 2012, the DCS mailed a copy of the summons to Mother's Florida address to notify her of the termination hearing. On August 23, 2012, the summons was returned showing that Mother was personally served on August 8, 2012.

Mother failed to appear at the August 29, 2012 initial hearing. Mother also failed to appear at the September 26, 2012 evidentiary hearing but was represented by counsel. At the beginning of the hearing, Mother's counsel requested a continuance "until a time when my client can be here" because she lives in Florida. Tr. p. 6.

The DCS responded that Mother had contacted the DCS the week before and had discussed the court date with the case manager. The DCS further pointed out that Mother had signed the summons, proving that she had adequate notice of the hearing. As for practical considerations, the DCS highlighted the fact that Mother had been living in Florida since the previous December and had not visited the Children in ten months. Finally, the DCS stressed that continuing the case would only "further delay permanency for the children." Tr. p. 7. The juvenile court denied Mother's motion to continue.

7

The evidentiary hearing proceeded on the termination petition. Laura Knutson, a family case manager with the DCS who was assigned to Mother's case until a few months before the termination hearing, testified that she had called Mother because she was concerned after Mother missed a visit. Mother informed Knutson that Boyfriend had assaulted her and that she was staying at a neighbor's house. Mother's injuries included a sore lip, a black eye, and one-half of her face was very swollen. Perhaps the most distressing aspect of the situation was that Mother was pregnant with Boyfriend's child at the time.

Knutson contacted law enforcement, and a service provider transported Mother to a domestic violence shelter. During intake, Mother disclosed that domestic violence had occurred between her and Boyfriend "too many [times] to count." Tr. p. 85.

Although Mother was encouraged to stay at the domestic violence shelter longer, she only stayed there for forty-five days because "she was only ordered to stay there forty-five days by the judge." Id. at 69-70, 84. Mother filed a police report but declined a protective order. Charges were filed against Boyfriend, and a no contact order was issued. Boyfriend was arrested at his father's house where he was living with Mother.

Because of this incident, Mother qualified for her own housing, but Mother missed her initial appointment. Additionally, Mother left the shelter to move back in with Boyfriend and his father, who was also her uncle, and she became "very secretive." Id. at 92. Mother continued to live with Boyfriend and his father despite the charges against

8

him, which were later dropped because she would not cooperate with the prosecutor's office.

In light of the fact that Mother declined a protective order, lost her housing eligibility because she left the shelter and moved back in with Boyfriend, and dropped the charges against Boyfriend, Scherer did not think that Mother could keep the Children safe because "[Mother] has a difficult time keeping herself safe." Tr. p. 71.

The Children suffered from medical conditions that required treatment and preventative measures. The Children have very bad teeth that require caps. Nevertheless, Mother brought candy and sugary drinks to visits to bribe the children into behaving.

Similarly, despite repeated instruction from medical personnel at Riley that Mother had to feed J.S. slowly through his G-tube to prevent aspiration, Mother would speed up his feeding. Mother failed parent care instructions and could not feed J.S. without assistance.

At first, Mother showed some motivation to work with home-based services about looking for employment and housing, independent living, good decision making, and role modeling. However, after a few months, Mother was not willing to participate in any services that did not benefit her personally, such as getting an identification card. Mother was denied SSI and did not have any income or transportation.

Mother did not progress beyond fully supervised visits because she did not understand safety for the Children and failed to make sufficient progress. More

specifically, Mother left the Children unattended during visits and was not able to focus on more than one child at a time. J.S. could not sit up by himself and during one visit, Mother left him sitting alone on the couch while she took C.S. to the bathroom. Mother did not redirect C.S.'s aggressive behavior and was often resistant to parenting prompts from the visit supervisor.

In short, Mother did not make "lasting changes or acknowledge[] the need for improved parenting" by the time of the termination hearing. Tr. p. 102, 106. The DCS never considered placing the Children back with Mother because "[s]he did not have the ability to process the information she was provided and in turn use it effectively when she was with the children. . . . They were not safe." Id. at 92-93.

Since the children's removal, C.S. was diagnosed with Rett's syndrome and is taking medication. Autism is the main symptom of Rett's syndrome. According to the Children's foster mother, C.S. is "like a completely different child." Id. at 53.

S.S. continues to have some speech and communication delays and is learning how to play. She has a developmental therapist and will have a psychological evaluation, but is otherwise doing well. Tr. p. 54.

J.S. suffers from ear infections and can only receive nutrition through his G-tube. But, he now weighs twenty-four pounds and is "pretty healthy." Id. at 55. Unfortunately, doctors believe that J.S. will always aspirate his food because his body does not respond normally when he aspirates to allow him to cough up food. The medical professionals in the neurology department at Riley believe that J.S. has cerebral palsy but have yet to

10

formally diagnose him. The medical personnel also believe that the type of cerebral palsy that J.S. has is likely caused by "trauma that was experienced in the first half of in utero pregnancy." Id. at 60.

Both the foster mother and the Court Appointed Special Advocate (CASA), Jessica Risher, testified that although Mother loved her children, she could not appropriately care for them and keep them safe. Risher recommended the termination of Mother's parental rights.

Similarly, accordingly to Jeff Stanton, the guardian ad litem (GAL), Mother "does not have the ability to provide the care necessary." Tr. p. 15. Mother "has a very, very low functioning capacity." Id. at 16. Stanton opined that this is "probably one of the most extreme cases that [he has] ever reviewed where a parent has been absent from the children." Id. Stanton further testified that he "would be hard-pressed to imagine that there's a bond between the children and their mother based on this absence." Id. at 17. Based on this fact and the Children's inability to thrive, Stanton also recommended termination of Mother's parental rights.

Knutson believed that termination was in the Children's best interests because they need permanency and stability that Mother cannot provide. Additionally, Mother cannot remedy the situation because of her learning disabilities and her presence in their lives poses a physical threat to their wellbeing. The plan for the Children was adoption.

On October 22, 2012, the juvenile court issued its order terminating the parent-child relationship between Mother and the Children. Mother now appeals.

11

DISCUSSION AND DECISION

Mother's sole argument on appeal is that she was denied procedural due process when the juvenile court terminated her parental rights after denying her motion for a continuance. We review a juvenile court's ruling on a motion for continuance in a termination of parental rights proceeding for an abuse of discretion. In re E.D., 902 N.E.2d 316, 321 (Ind. Ct. App. 2009). It is axiomatic that an abuse of discretion occurs if a parent is denied due process in termination proceedings. Indeed, we have said:

> The Due Process Clause of the United States Constitution prohibits state action that deprives a person of life, liberty, or property without a fair proceeding. When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. The nature of the process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding, (2) the risk of error created by the State's chosen procedure, and (3) the countervailing governmental interest supporting use of the challenged procedure.

In re C.C., 788 N.E.2d 847, 852 (Ind. Ct. App. 2003) (internal citations omitted).

In this case, the private interests of Mother are substantial. To be sure, we have repeatedly recognized that parents' interest in the care, custody, and control of their children is one of the most valued relationships in our society. In re B.J., 879 N.E.2d 7, 16 (Ind. Ct. App. 2008); In re C.C., 788 N.E.2d at 852. Specifically, "the right to raise one's child is an 'essential, basic right that is more precious than property rights.'" In re B.J., 879 N.E.2d at 16 (quoting In re C.C., 788 N.E.2d at 852)).

The second factor requires us to assess the risk of error created by the challenged procedure. Here, the challenged procedure is Mother's absence from the termination

12

evidentiary hearing. At the outset, we observe that although Indiana Code section 31-35-2-6.5(e) states that a court must provide a party the opportunity to be heard, it does not confer a constitutional right to be present at the hearing. In re B.J., 879 N.E.2d at 16.

In this case, Mother was represented by counsel throughout the termination hearing. Indeed, her counsel requested the continuance that is the subject of this appeal, questioned witnesses, and gave a closing argument. Tr. p. 5, 101-102.

Moreover, Mother has failed to show prejudice. Specifically, Mother's counsel stated that Mother had her telephone number and knew how to contact her. Id. at 6-7. Additionally, Mother was aware of the date of the termination hearing because she signed the summons and spoke with Tamela Samuels, the current case manager, about the hearing. Id. at 99-100. Under these facts and circumstances, the risk of error created by the juvenile court denying Mother's motion for a continuance is minimal.

The third factor, the countervailing government interest, considers the State's significant parens patriae interest in protecting the welfare of children by intervening when parental neglect, abuse, or abandonment are at issue. In re E.D., 902 N.E.2d at 321. In assessing this factor, we have recognized that delays in adjudication impose significant costs on the children involved. In re B.J., 879 N.E.2d at 17.

Here, Mother has experienced significant exposure to domestic violence. Specifically, Florida CPS became involved after Mother was physically assaulted by Father while she was pregnant with J.S. Appellee's App. p. 64. And medical

professionals at Riley believe that J.S. has cerebral palsy that is likely from "trauma that was experienced in the first half of in utero pregnancy." Tr. p. 60.

Similarly, while Mother was pregnant with Boyfriend's child, Boyfriend assaulted her. Id. at 81-82. Mother had a sore lip, a black eye, and one-half of her face was swollen. Id. at 82. Mother was transported to a domestic violence shelter, but stayed for only the minimum time ordered by the judge. Id. at 69-70. Mother moved back in with Boyfriend and his father even though she was encouraged by her family case worker and family consultant to stay in the shelter. Id. at 84. In short, Mother has difficulty "keeping herself safe." Id. at 71.

Mother also has problems meeting the Children's medical needs. Although the Children have very bad teeth, Mother would bring sugary snacks and drinks to visits to bribe them into behaving. Tr. p. 64-65. Mother overmedicated C.S. with her seizure medication, and Mother disobeyed repeated instructions to feed J.S. slowly through his G-tube. Id. at 68-69.

Moreover, after removing the Children, the DCS never considered placing them back with Mother because she lacked the ability to process information and use it effectively when parenting the children. Tr. p. 92-93. Likewise, Mother failed to make any lasting changes; instead, she left the state shortly after the dispositional order was entered. Appellee's App. p. 76-78; Tr. p. 72.

Perhaps most compelling, since the Children's removal, C.S. has been properly diagnosed and medicated and is "like a completely different child." Tr. p. 53. S.S. has

some developmental delays, but is working with a therapist and doing well. Id. at 54. And J.S. now weighs twenty-four pounds and is "pretty healthy." Id. at 55. Further, Mother voluntarily left her children and did not see them for ten months. Indeed, the GAL testified that he "would be floored if there was . . . any bond whatsoever based upon the absence of the parent." Id. at 18. To be sure, the State's interest in protecting these children from harm is great.

Upon balancing the Mother's interest, the risk of error by not having Mother present, and the State's interest in protecting the welfare of these children, we conclude that under the facts and circumstances of this case, the juvenile court did not deny Mother due process of law when it denied her motion for a continuance.

The judgment of the juvenile court is affirmed.

MAY, J., and MATHIAS, J., concur.